**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **RAUDELL MERCADO,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO.** |
| | : | **3:16-CV-1622** |
| **v.** | : | |
| | : | **May 25, 2018** |
| **DEPARTMENT OF** | : | |
| **CORRECTIONS, ET AL.,** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 116]**

**I.    Introduction**

Plaintiff Raudell Mercado brings this action pursuant to 42 U.S.C. § 1983,

alleging violations of the First and Fourteenth Amendments to the United States

Constitution, and pursuant to Title II of the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12132.  Now before the Court is Defendants' Motion for

Summary Judgment on all claims.  For the reasons that follow, Defendants'

Motion is GRANTED IN PART and DENIED IN PART.

**II.    Background**

From December 20, 2013 through August 5, 2015, medical staff at Manson

Youth Institution ("Manson") and other Connecticut Department of Correction

("DOC") facilities at which Plaintiff was incarcerated, consistently diagnosed him

as having bipolar disorder and attention deficit, hyperactivity disorder ("ADHD").

[Pl. Exh. A ¶¶3-12].  Bipolar disorder is a serious and chronic mental illness,

which when left untreated, can leave individuals profoundly depressed (including

resorting to suicide) or presenting with psychotic features, including illusions of

grandeur. [Def. Exh. 3 ¶ 15]. Throughout this time period, Plaintiff was prescribed lithium and traxadone. [Pl. Exh. A ¶¶ 6-7].

On March 3, 2015, Raudell Mercado was admitted to the custody of the DOC as a pre-trial detainee and placed at the New Haven Correctional Center. [Def. Exh. 1]. Less than three weeks later, the Plaintiff was transferred to Manson. He remained at Manson until August 5, 2015, when he was transferred to Cheshire Correctional Institution ("Cheshire") because he assaulted correctional staff. [Def. Exh. 1; Def. Exh. 2 at 27; Def. Exh. 3 ¶ 10].

Two days later, he was transferred to Garner Correctional Institution ("Garner") for a mental health evaluation to determine if he needed psychiatric care of the type provided at Garner. [Def. Exh. 1; Def. Exh 3 ¶ 10]. Plaintiff remained at Garner from August 7, 2015 until August 28, 2015. Despite offering evidence regarding Garner's standard practices for evaluating inmates, Defendants do not offer any admissible evidence regarding Plaintiff's psychiatric evaluation while at Garner.

Garner is the Connecticut prison that provides psychiatric care for inmates determined to be mentally ill and requiring special management. [Def. Exh. 3 ¶ 10]. The phrase "mentally ill" means that a person has a chronic and severe Axis I mental illness. In the field of psychiatric disorders, Axis I includes schizophrenia, bipolar disorder, major depression, and thought disorders/psychosis. [Def. Exh. 4 at 48]. The Department of Correction has a standard protocol for diagnosing inmate mental illness. At the first step, a psychiatric treatment team completes a four-page mental health evaluation,

which reviews demographic information, family history, legal history, psychiatric history, medication history, physical history including head injuries, surgeries, other injuries, and allergies. *Id.* at 54-55. In general, if an inmate has a psychiatric history, the psychiatric treatment assessment team would examine his medication history, risk history, current risk factors, substance abuse history, active substance abuse, and any programs that he may have participated in and the results of those programs. *Id.* at 55. The evaluation would also examine the inmate's prior incarceration and treatment history while incarcerated. *Id.*

The next stage of the evaluation process is a face to face clinical interview with one or more doctors who would have already reviewed not only the four page evaluation, but also the inmate's medical and mental health records from the DOC and outside health centers. *Id.* at 56. Upon completion of the background and face to face evaluations, the treatment team determines how the inmate presents diagnostically to the doctors, and an actual diagnostic category is chosen. *Id.* at 55. This diagnostic recommendation is then forwarded to the Director of Psychology or Psychiatry along with the four-page history and face to face evaluation, whereupon the director reviews it and makes a final determination as to whether the inmate is mentally ill and should remain at Garner, or is not mentally ill and may be transferred to another institution, such as Northern Correctional Institution ("Northern"). *Id.* at 56. If an inmate who is to be transferred to Northern due to violent conduct is in fact mentally ill, the inmate will not be transferred to Northern, unless his behavior is too dangerous to house him at Garner. *Id.* at 60.

In those rare cases when an inmate is mentally ill but too dangerous to be at Garner, he will be sent to Northern, but managed safely in a clinical manner. *Id.* at 75. If an inmate is not found to be mentally ill and is therefore cleared for transfer to Northern, he will be provided with another mental health screening by a nurse or social worker within 24 hours of arrival at Northern, and will have monthly follow-up appointments with a social worker, psychologist Defendant Dr. Mark A. Frayne, and psychiatrist Defendant Dr. Gerard G. Gagne. *Id.* at 76. There are three nurses on two of the three shifts at Northern, and one additional nurse who works the night shift. *Id.* at 80. Dr. Frayne is the only psychologist on staff at Northern and he works the first shift. *Id.* Dr. Gagne visits Northern twice per week to serve whatever psychiatric needs exist in the inmate population. [*Id.* at 80-81; Def. Exh. 5 ¶ 3].

The Northern mental health screening is an abbreviated version of the four-page mental health assessment conducted at Garner, and covers the inmate's psychiatric history, risk history, injury history, and substance history, as well as containing a diagnostic section and formulation. [Def. Exh. 4 at 77]. The inmate's entire DOC medical and mental health files are transported with the inmate and reviewed by intake personnel when the inmate is transferred to Northern. *Id.* at 81. In Plaintiff's case, these files would have included mental health records from Plaintiff's prior stints in DOC custody, including those indicating that Plaintiff suffered from bipolar disorder and ADHD. [Pl. Exh. B at 87].

If the inmate is on medication, the prescriptions are transferred electronically at the time of transfer, and the nurse clinician who manages

medications will schedule an appointment with Dr. Gagne to review the medications and determine if the prescriptions are appropriate, should be changed, or should be tapered down and eventually stopped. [Def. Exh. 4 at 82]. Dr. Gagne consults with Dr. Frayne regarding medications, but ultimately the decision regarding whether or not medication is appropriate belongs to Dr. Gagne. *Id.* at 83. When making his determination, Dr. Gagne meets with the inmate for a session, shares his impression, and discusses the risks and benefits of the medication at issue, including short and long term side effects. *Id.* Sometimes Dr. Frayne will be present during the session along with Dr. Gagne, and often a nurse clinician and social worker will also be present. *Id.* at 84.

Shortly after Plaintiff's August 28, 2015 arrival at Northern, Dr. Gagne met with him. [*Id.* at 89; Def. Exh. 5 ¶ 3; Def. Exh. 6 at 19]. Dr. Gagne interviewed Plaintiff a number of times after his intake both in standard sessions and as the result of safety interventions. [Def. Exh. 4 at 89; Def. Exh. 5 ¶ 3; Def. Exh. 6 ¶ 19]. Dr. Frayne also met with plaintiff shortly after his arrival at Northern and after reviewing the Garner Psychiatric Treatment Assessment Team's treatment notes. [Def. Exh. 3 ¶ 13; Def. Exh. 4 at 92]. However, these treatment notes were not submitted into evidence with Defendants' motion for nor Plaintiff's opposition to summary judgment. When Dr. Frayne met with him, Plaintiff insisted that he was seriously mentally ill, that he had bipolar disorder, and that he should be treated accordingly. [Def. Exh. 3 ¶ 13; Def. Exh. 4 at 91]. Plaintiff also told Drs. Frayne and Gagne that he should be provided with medications for bipolar disorder and

ADHD, specifically including lithium and trazadone.  [Def. Exh. 3 ¶ 17; Def. Exh. 4 at 123; Pl. Exh. A ¶ 15].

Based upon Plaintiff's past history, his trajectory through youth residential programs, hospital placements, and his impulsive, aggressive, moody, and angry manners, Defendants opined that it would not have been unusual for him to been diagnosed with a conduct disorder.  [Def. Exh. 4 at 90, 92-95; Def. Exh. 6 ¶¶ 11-12].  People with antisocial personality disorder typically have no regard for right and wrong, resulting in frequent trouble or conflict.  They may lie, be deceitful, repeatedly violate the rights of others, intimidate others, be aggressive or violent, lack remorse, be impulsive and easily become agitated.  [Def. Exh. 3 ¶ 26; Def. Exh. 4 at 105; Def. Exh. 5 ¶¶ 5-6; Def. Exh. 6 ¶ 28].  People with narcissistic personality disorder lack empathy.  They have a sense of entitlement and superiority, which if questioned, or if their desire for something is denied, they will react with rage and will make efforts to devalue, belittle or destroy the person they see as blocking them from what they want or holding them accountable for their actions, out of revenge.  [Def. Exh. 4 at 106-07; Def. Exh. 5 ¶¶ 5-6; Def. Exh. 6 ¶¶ 28-29].  Defendants diagnosed Plaintiff as having antisocial personality disorder and narcissistic personality disorder rather than bipolar disorder or ADHD.  [Def. Exh. 3 ¶¶ 17, 26-27, 29; Def. Exh 5 ¶ 4; Def. Exh. 6 ¶¶ 16-17; Dkt. No. 124-1 ¶ 37].  Having diagnosed Plaintiff with antisocial disorder, Defendants discontinued Plaintiff's bipolar and ADHD medications.  [Pl. Exh. A ¶¶ 14-16; Pl. Exh. B at 90].

After Plaintiff was admitted to Northern, Plaintiff received regular mental health evaluations and treatment and was not held in isolation.  He was housed in a cell, but had access to correctional staff that conducted tours and checked on each cell every fifteen minutes, 24 hours per day.  [Def. Exh. 3 ¶ 34; Def. Exh. 4 at 79; Def. Exh. 5 ¶ 14].  He also had access to mental health providers who tour to block one per day, seven days per week, as well as nurses who tour the block when medications are administered. [Def. Exh. 4 at 79; Def. Exh. 5 ¶ 7; Def. Exh. 6 ¶¶ 20-22].  Plaintiff was also offered regular mental health treatment at least once per month.  [Def. Exh. 3 ¶ 34; Def. Exh 5 ¶¶ 7-8; Def. Exh. 6 ¶¶ 17, 19, 20, 22].  Each time the Plaintiff is admitted to Northern or Cheshire, he is evaluated by their respective Mental Health Staff and offered regular mental health treatment at least once per month.  [Def. Exh. 5 ¶¶ 7, 10, 14; Def. Exh. 6 ¶ 19].

Dr. Frayne testified that from August 28, 2015 when Plaintiff's arrived at Northern to the present, Defendants classified Plaintiff's mental health score as 3. [Def. Exh 4 at 100-01].  As an inmate with a mental health score 3, the Plaintiff's treatment plan consisted of a focus on his behaviors.  He was provided with the opportunity for talk therapy in a group with two other inmates, in which he participated most of the time.  [Def. Exh. 3 ¶ 34; Def. Exh. 4 at 101-02; Def. Exh. 5 ¶¶ 19-21].

Plaintiff is not disorganized or disheveled.  He maintains a neat and well-organized cell and his personal hygiene is very good.  [Def. Exh. 5 ¶ 25].  When Plaintiff has acted out with an episode of self-injury, he has been placed on

Behavior Observation Status to ensure his personal safety.  [Def. Exh. 3 ¶¶ 37-38; Def. Exh. 5 ¶ 26].

Plaintiff argues that after he filed a grievance against Dr. Frayne complaining about the failure of Dr. Frayne and Northern to provide him with care for bipolar disorder and ADHD, Dr. Frayne retaliated by placing Plaintiff on behavioral observation status.  [Pl. Exh. A ¶ 18; Pl. Exh B at 118-19].  Plaintiff also asserts that because he was denied appropriate treatment for bipolar disorder and ADHD, he engaged in behavior consistent with these disorders, and was then punished for those behaviors by placement in administrative and punitive segregation and on behavioral observation status.  [Pl. Exh. A ¶ 17].

Behavioral Observation Status is an "intervention, determined by a qualified mental health professional, to extinguish maladaptive behaviors while maintaining safety and security of the inmate."  Department of Correction Administrative Directive 9.4.3F, available at portal.ct.gov/-/media/DOC/Pdf/Ad/ad0904pdf.pdf?la=en, last visited May 24, 2018.  The purpose of this status is to "preserve the order, safety and security of correctional facilities to comply with the law, and to manage inmate behavior."  Department of Correction Administrative Directive 9.4.1, *id*.  "For inmates who are using maladaptive behaviors, such as threatening self harm without intent or destroying property to avoid compliance with custody requirements such as housing or disciplinary actions, Behavioral Observation Status shall be initiated. Behavioral Observation Status shall be utilized in areas other than an infirmary/hospital Unit but shall be limited to housing areas in which custody

staff routinely conduct 15 minute tours." Department of Correction Administrative Directive 9.4.17D, *id*.

Plaintiff filed multiple grievances regarding Northern's failure to provide him treatment for bipolar disorder and ADHD, but these grievances were denied. [Pl. Exh. A ¶ 22].

Plaintiff graduated from the administrative segregation program on or about February 29, 2016, at which time he was transferred to Cheshire where he received similar treatment and care by the complement of mental health providers at that facility. [Def. Exh. 1; Def. Exh. 3 ¶¶ 37-38; Def. Exh. 5 ¶ 11]. Plaintiff was and is being afforded steady contact with mental health staff at Northern and Cheshire, and Plaintiff is familiar with and has used these facilities' 24-hour safety plans for mental health inmates. [Def. Exh. 5 ¶ 14]. However, Plaintiff asserts that after his transfer to Cheshire, and while he was on administrative segregation there, Gagne ordered him to speak with him one on one, and made sexually inappropriate comments about his physical appearance. [Pl. Exh. A. ¶ 19]. Plaintiff alleges that he reported this conduct, but no action was taken in response. [Pl. Exh. A ¶ 19]. Northern's warden, Anne Cournoyer, was periodically consulted about plaintiff's placement on Behavior Observation Status, but his behavioral treatment plan was the decision of the mental health staff at the facility. [Def. Exh. 3 ¶¶ 2-8, 30, 34; Def. Exh. 5 ¶¶ 2-4, 14].

III. Standard of Review

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied" because there exists a genuine issue of fact.  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted).  In addition, "the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury."  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir. 1996)).  "Summary judgment cannot

be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 251).

IV.  Discussion

     **A.** Exhaustion of Administrative Remedies

42 U.S.C. § 1997e governs actions brought by prison inmates.  Section 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  This subsection applies to all claims regarding prison life.  *See Porter v. Nussle*, 534 U.S. 516, 532 (2002). Section 1997e requires exhaustion of any available administrative remedies, regardless of whether they provide the relief the inmate seeks.  *See Booth v. Churner*, 532 U.S. 731, 741 (2001).  A claim is not exhausted until the inmate complies with all administrative deadlines and procedures.  *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006).

Informal efforts to put prison officials on notice of inmate concerns do not satisfy the exhaustion requirement.  *See Marcias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).  If the deadline to file a grievance has passed, an unexhausted claim is barred from federal court.  *See Woodford*, 548 U.S. at 95.  An inmate may be excused from the exhaustion requirement "only where (1) administrative remedies were not in fact available; (2) prison officials have forfeited, or are estopped from raising, the affirmative defense of non-exhaustion; or (3) 'special

circumstances . . . justify the prisoner's failure to comply with the administrative procedural requirements.'" *Adekoya v. Federal Bureau of Prisons*, 375 Fed. App'x 119, 121 (2d Cir. 2010) (quoting *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004). The courts have found special circumstances where the failure to exhaust administrative remedies was caused by a reasonable but erroneous interpretation of prison regulations. *See Bennett v. James*, 737 F. Supp. 2d 219, 227 (S.D.N.Y. 2010), *aff'd*, 441 Fed. App'x 816 (2d Cir. 2011).

"Failure to exhaust administrative remedies under the PLRA is an affirmative defense, and thus the defendants have the burden of proving that [Plaintiff's] claims have not been exhausted." *Bennett*, 737 F. Supp. 2d at 225 (citing *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009)). The Second Circuit employs a burden shifting framework where the parties dispute the extent to which an administrative remedy was available. "Defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (citations and quotations omitted). "If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors—for example, threats from correction officers—rendered a nominally available procedure unavailable as a matter of fact. *Id.* (citing *Hemphill*, 380 F.3d at 687-88). Defendants have met their initial burden regarding the availability of remedies by submitting the Administrative

Directives governing the "Inmate Administrative Remedy Process" and the "Health Services Review" procedure. [Def. Exh. 8; Def. Exh. 9].

Plaintiff does not argue that administrative remedies were unavailable. Rather, he argues that he in fact availed himself of these remedies prior to filing suit. In support, Plaintiff asserts in his affidavit that he "filed grievances with prison officials challenging the defendants' failure to provide adequate mental health treatment" and that "[t]he grievances were all denied." [Pl. Exh. A ¶ 22]. Additionally, Frayne testified in his deposition that while he did not have documentation of the grievances in front of him, it would be consistent with Plaintiff's "character pathology" to file grievances. [Pl. Exh. B at 119]. In response to a question asking whether Plaintiff "filed a grievance complaining that [Frayne] retaliated against him for him filing a grievance against [Frayne]," Frayne responded, "I would see that all day long with him, yeah." *Id.*

Defendant argues that this evidence is insufficient, because Plaintiff "did not provide a copy of any informal resolution, grievance(s), or grievance appeals that he claims to have filed while he was at Northern Correctional Institution regarding the issues that gave rise to his complaint." [Dkt. No. 125 at 2]. Defendant did not cite, and the Court is unaware of, any authority that requires Plaintiff to offer on summary judgment copies of written grievances, particularly where, as here, one of the Defendants testified that Plaintiff likely filed multiple grievances, and Plaintiff has offered a sworn statement confirming that he did so. Defendants bear the burden of proving that Plaintiff did not exhaust his administrative remedies. While it is often difficult to prove a negative, the DOC

Administrative Directives establishing a multi-step grievance process established that Defendants' counsel at the least would have access to public records, a search of which would have enabled the Defendants to present evidence of an absence of evidence that Plaintiff filed a grievance. *See* Fed. R. Evid 803(7); Department of Correction Administrative Directive 9.6, Def. Exh. 8. Defendants have failed to meet their burden of showing that there is no evidence that Mercado filed a grievance challenging his medical care or Frayne's inappropriate conduct and retaliation. Accordingly, summary judgment on this issue is DENIED.

### B. Deliberate Indifference

Plaintiff claims that by failing to provide him with appropriate treatment for bipolar disorder, they were deliberately indifferent to his medical needs. Defendants argue that they were not indifferent to Plaintiff's medical needs, because they offered Plaintiff appropriate medical care for antisocial and narcissistic personality disorders, and because they determined that Plaintiff did not suffer from bipolar disorder. Plaintiff counters that Department of Correction officials had previously diagnosed him with bipolar disorder and ADHD, and that Defendant's failure to provide treatment consistent with these earlier diagnoses constituted deliberate indifference.

Claims for deliberate indifference to a serious medical need of a pretrial detainee are considered under the Fourteenth Amendment, while claims of sentenced inmates are considered under the Eighth Amendment. In either case, however, the standard is the same. *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir.

2009).  To state a claim for deliberate indifference to a serious medical need, Plaintiff must show both that his medical need was serious and that Defendant acted with a sufficiently culpable state of mind.  *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (citing *Estelle v. Gamble*, 492 U.S. 97, 104 (1976)).  There are both objective and subjective components to the deliberate indifference standard. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  Objectively, the alleged deprivation must be "sufficiently serious."  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  The condition must produce death, degeneration or extreme pain. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  The parties agree that Plaintiff engaged in self-harming activities after his transfer to Northern, and Defendant does not dispute that a failure to provide appropriate treatment for bipolar disorder could constitute a serious deprivation.

Subjectively, the Defendants must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of their actions or inactions.  *Salahuddin v. Goord*, 467 F.3d 262, 279-80 (2d Cir. 2006). Negligence that would support a claim for medical malpractice does not rise to the level of deliberate indifference cognizable under Section 1983.  *Id.*  Because mere negligence will not support a Section 1983 claim, not all lapses in prison medical care constitute a constitutional violation.  *Smith*, 316 F.3d at 184.  Nor does a difference of opinion regarding what constitutes an appropriate response and treatment constitute deliberate indifference.  *Ventura v. Sinha*, 379 Fed. App'x 1, 2-3 (2d Cir. 2010); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

In addition, inmates are not entitled to the medical treatment of their choice. *See Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Mere disagreement with prison officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703. The conduct complained of must "shock the conscience" or constitute a "barbarous act." *McCloud v. Delaney*, 677 F. Supp. 230, 232 (S.D.N.Y. 1988).

Defendants argue that they subjectively did not believe that treatment for bipolar disorder or ADHD was medically appropriate. They offer evidence that Frayne and Gagne believed that Plaintiff's previous diagnosis of bipolar disorder and ADHD was inaccurate, and that the diagnoses of antisocial personality disorder and narcissistic personality disorder better fit his symptoms. However, the only evidence Defendants offer in support of their position that they subjectively believed that Plaintiff did not suffer from bipolar disorder, and therefore that their failure to treat Plaintiff for bipolar disorder was medically justified, is the deposition testimony of Dr. Frayne, and the affidavits of Drs. Frayne and Gagne. Defendants have not submitted into evidence any documentation regarding the psychiatric evaluations conducted at Garner, or any treatment notes or other clinical documentation supporting Dr. Frayne's and Dr. Gagne's medical opinions prepared at the time of their diagnosis that he did not suffer from bi-polar disorder or ADHD. The absence is inconsistent with the

diagnostic protocol which Defendants entered into evidence, which specifically states (1) that a four-page evaluation encompassing demographic and family information, legal history, psychiatric and medication history, physical history, risk history, current risk factors, substance abuse history, and a formal diagnostic formulation would have been completed at Garner; (2) that a two-page abbreviated mental health assessment encompassing psychiatric history, risk history, injury history, substance history, and diagnostic formulation would have been completed upon intake at Northern; (3) that records existed regarding the decision not to continue Plaintiff's medications at Northern; and (4) that an individualized mental health treatment would have been prepared for Plaintiff by Frayne and his staff. [Def. Exh. 4 at 54-56, 76-77, 90, 100]. *See* Fed. R. Evid 803(7).

Plaintiff disputes that Drs. Frayne and Gagne subjectively believed that he did not suffer from bipolar disorder, suggesting that Defendants deliberately chose to ignore Plaintiff's prior diagnosis in favor of new diagnoses that required less intense medical supervision. Plaintiff offers no evidence in support of his suspicion other than his own affidavit, medical records from Manson confirming his prior bipolar disorder diagnosis and medications, and a Hartford Courant article describing Connecticut's decision to transfer responsibility for inmate health from UConn Health to the DOC. [Pl. Exh. A; Pl. Exh. C].

Plaintiff's belief that he is bipolar is insufficient to maintain an Eighth Amendment deliberate indifference claim. *See Dean*, 804 F.2d at 215. Nor is the

fact that another doctor diagnosed Plaintiff as being bi-polar. A difference of opinion does not establish deliberate indifference. *Hernandez v. Keane*, 341 F.3d 137, 146-47 (2d Cir. 2003) (summary judgment appropriate where claim based on risky treatment); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (holding a defendant must draw the inference that he is exposing an inmate to a substantial risk of serious harm by failing to provide the treatment at issue). The defendant must be actually aware that he is subjecting the Plaintiff to a substantial risk of serious harm. *Salahuddin*, 467 F. 3d at 280-81. It is also insufficient to establish that they reached an erroneous diagnosis as negligence or malpractice do not constitute deliberate indifference. *Hernandez*, 341 F.3d at 144.

   Plaintiff offers no treatment or other evidence of Defendants' state of mind. The Hartford Courant article notes that UConn's quality controls were "substandard" and that "corrections investigators noted violations of medical protocols" with respect to 14 inmate deaths. However, the article does not mention Drs. Frayne or Gagne, and does not mention any shortcomings in the provision of psychiatric care in DOC facilities. While it is admittedly difficult for a plaintiff to offer evidence regarding a defendant's subjective state of mind, it is not impossible. For instance, a plaintiff could offer evidence that his symptoms were so inconsistent with a particular diagnosis that a provider must have known that the diagnosis was incorrect. Plaintiff has offered no evidence that his symptoms were inconsistent with his diagnoses of antisocial or narcissistic personality disorders, such that Drs. Gagne and Frayne knew or recklessly disregarded any risk that their diagnoses were incorrect.

For their part, Drs. Frayne and Gagne both claim that they relied upon the Garner psychiatric evaluation in forming their opinions about Plaintiff's mental condition. Defendants' diagnosis of Plaintiff based on information collected and a clinical an evaluation conducted by one member of the evaluation team is not inconsistent with the diagnostic protocol which describes the information collected on the inmate and states a face-to-face clinical evaluation is conducted "by one or more doctors." [Def. Exh. 4 at 56]. Upon completion of the background and face to face evaluations, the treatment team determines how the inmate presents diagnostically to the doctors, and an actual diagnostic category is chosen. [Def. Exh. 4 at 55]. This diagnostic recommendation is then forwarded to the Director of Psychology or Psychiatry along with the four-page history and face to face evaluation, whereupon the director reviews it and makes a final determination as to whether the inmate is mentally ill and should remain at Garner, or is not mentally ill and may be transferred to another institution, such as Northern Correctional Institution ("Northern"). [Def. Exh. 4 at 56]. In fact, this establishes a deliberative process in which physicians are expected to rely on the opinion of others in reaching their own medical opinion.

Notwithstanding, Dr. Gagne interviewed Plaintiff a number of times after his intake both in standard sessions and as the result of safety interventions. [Def. Exh. 4 at 89; Def. Exh. 5 ¶ 3; Def. Exh. 6 ¶ 19]. Dr. Frayne also met with Plaintiff shortly after his arrival at Northern and after reviewing the Garner Psychiatric Treatment Assessment Team's treatment notes. [Def. Exh. 3 ¶ 13; Def. Exh. 4 at 92]. As noted above, Defendants also introduced evidence stating that their files

ahold include written notes regarding the decision to discontinue Plaintiff's medication. [Def. Exh. 4 at 54-56, 76-77, 90, 100]. The absence of written notes regarding the decision to discontinue Plaintiff's medication as required by the protocol raises a genuine issue of fact as to Defendants' subjective belief which led to their rejection of Plaintiff's diagnoses of bi-polar disorder and ADHD, their alternate diagnosis and the cessation of Plaintiff's bi-polar and ADHD medications. *See* Fed. R. Evid 803(7). Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain which may be manifested by intentionally interfering with the treatment once prescribed. *Estelle v. Gamble*, supra.

A complaint that a physician has been negligent in diagnosing or treating a condition does not state a valid claim of deliberate indifference. *Id.* Defendants do not contend that they mistakenly discontinued Mercado's bi-polar and ADHD medications. Accordingly, Plaintiff has raised a triable issue of fact on the subjective prong of the deliberate indifference standard. Summary judgment is therefore DENIED.

C. Liability of Personnel Other than Frayne and Gagne Under Section 1983

A prison official cannot be personally liable under Section 1983 on the basis of *respondeat superior* or simply because he is atop the prison hierarchy. *See Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995). Because a supervisor cannot be held liable for simply being a supervisor, "proof of linkage in the prison chain of command" is insufficient to establish liability. *Hernandez*, 341 F.3d at 145 (internal quotation marks and citation omitted). Rather, a prison official must

have some degree of personal involvement in an alleged constitutional deprivation to be personally liable. *Lewis v. Cunningham*, 483 F. App'x 617, 618-19 (2d Cir. 2012); *see also Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (It is "well established in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). Consequently to state a claim under Section 1983, a plaintiff must demonstrate the personal involvement of the defendant. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

Supervisory liability may be "'imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision or control of his subordinates." *Odom v. Matteo*, 772 F. Supp. 2d 377, 403 (D. Conn. 2011) (internal quotation marks and citation omitted). Supervisory liability may be established by the following factors articulated by the Second Circuit in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995):

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* In addition, the plaintiff must demonstrate an affirmative causal link between the supervisory official's failure to act and his injury. *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

Defendants argue that officials other than Drs. Frayne and Gagne must be dismissed as defendants because they were not personally involved in the actions which Plaintiff alleges violated his constitutional rights. The only fact asserted by either party regarding any official other than Drs. Frayne or Gagne is that NCI's Warden, Ann Cournoyer, was periodically consulted about Plaintiff's placement on Behavior Observation Status, but that his behavioral treatment plan was the decision of the mental health staff at the facility. [Dkt. No. 116-2 ¶ 61]. Plaintiff did not dispute this fact. Indeed, while Plaintiff has not explicitly abandoned his claims against the other Defendants, he has not advanced any argument suggesting that Cournoyer or anyone other than Drs. Frayne or Gagne should remain as a Defendant to Plaintiff's Section 1983 claims. [*See* Dkt. No. 124 at 15]. Absent evidence in the record that any officials other than Drs. Frayne and Gagne violated Plaintiff's constitutional rights, claims against the remaining officials must be DISMISSED.

D. <u>Sexual Harassment</u>

Plaintiff alleges that Dr. Gagne "made sexually inappropriate comments about [his] physical appearance." [Pl. Exh. A ¶ 19]. "Sexual abuse by a corrections officer may constitute cruel and unusual punishment if it is severe or repetitive. Thus, a single incident of sexual abuse, if sufficiently severe or serious, may violate an inmate's Eighth Amendment rights." *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015) (citations omitted). Plaintiff has offered no argument in support of his allegation that Dr. Gagne sexually harassed him in violation of the Eighth or Fourteenth Amendments. Moreover, Plaintiff has failed

to offer evidence from which a reasonable jury could conclude that Dr. Gagne's conduct was sufficiently severe or repetitive to constitute a constitutional violation.  Namely, it is not enough to assert in a conclusory fashion that Dr. Gagne made "sexually inappropriate comments" without revealing the substance of these comments, or what about them was "sexually inappropriate."  This is particularly true here, because Dr. Gagne could have a professional and appropriate reason to comment about his patient's physical appearance, and a reasonable jury could not conclude that comments about a patient's physical appearance without more was "sexually inappropriate," or constituted severe or serious sexual abuse.  Defendants' motion for summary judgment with respect to the sexual harassment claim must therefore be GRANTED.

      **E.**  <u>First Amendment Retaliation</u>

To sustain a First Amendment retaliation claim, a prisoner must demonstrate the following:  "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).  Plaintiff stated in his affidavit that "[o]n one occasion, Dr. Frayne placed [him] in behavioral observation status because [he] filed a complaint with [Dr. Frayne's] supervisor about his mistreatment."  [Pl. Exh. A ¶ 18].

Defendants do not argue that filing complaints regarding prison conditions is not constitutionally protected. Rather, they argue that Plaintiff was never placed on behavioral observation status for a retaliatory purpose. Dr. Frayne admits to having little memory of Plaintiff's complaints regarding Dr. Frayne's conduct. He therefore does not dispute Plaintiff's allegations other than to insist that he only placed Plaintiff on behavioral observation status for legitimate reasons, such as to protect Plaintiff from harming himself. While Defendants submitted a document listing each of Plaintiff's disciplinary infractions and their dispositions, they did not submit any documentary evidence regarding when or why Plaintiff was placed on behavioral observation status. The Court therefore cannot determine whether Dr. Frayne's actions were retaliatory without improperly weighing Plaintiff's credibility against Dr. Frayne's. Summary judgment on the First Amendment retaliation claim must therefore be DENIED.

### F. Americans with Disabilities Act

Title II of the ADA, entitled "Public Services," provides, in relevant part: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In order to establish a prima facie violation under the ADA, Plaintiff must show that (1) he is a qualified individual with a disability; (2) Defendant DOC is an entity subject to the acts; and (3) Plaintiff was denied the opportunity to participate in or benefit from the DOC's services, programs, or activities or DOC otherwise discriminated

against him by reason of his disability.  *See Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).  "[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates," *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998), and Defendants concede for the purpose of their motion that the DOC is an instrumentality of the State of Connecticut and thus subject to the Act.  [Dkt. No. 116-1 at 22-23].

An individual is disabled under the ADA if he suffers from "a physical or mental impairment that substantially limits one or more of the major life activities of such individual" if he has "a record of such an impairment," or if he "is regarded as having such an impairment."  42 U.S.C. § 12102(1).  A mental impairment is "[a]ny mental or psychological disorder such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability."  28 C.F.R. § 35.108(b)(1).  "Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(1).  The definition of "disability" must be "construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA," 28 C.F.R. §§ 35.101(b), 35.108(a)(2)(i).  As such, "the term [']major['] shall not be interpreted strictly to create a demanding standard," 28 C.F.R. § 35.108(c)(2)(i), and "the term 'substantially limits' shall be construed broadly in favor of expansive coverage."  28 C.F.R. § 35.108(d)(1)(i).  "[T]he threshold issue of

whether an impairment substantially limits a major life activity should not demand extensive analysis."  28 C.F.R. § 35.108.

"Bipolar Affective Disorder has been recognized as a disability under the ADA."  *Glowacki v. Buffalo Gen. Hosp.*, 2 F. Supp. 2d 346, 351 (W.D.N.Y. 1998); *see also Horwitz v. L & J.G. Stickley, Inc.*, 122 F. Supp. 2d 350, 354 (N.D.N.Y. 2000), *aff'd*, 20 F. App'x 76 (2d Cir. 2001) ("There is little doubt that bipolar disorder can constitute an impairment.").  The ADA requires an "individualized assessment" which prevents the Court from determining that Plaintiff is disabled solely on the basis of his diagnosis.  *See* 28 C.F.R. § 35.108(d)(1)(vi).  However, "whether an impairment substantially limits a major life activity [must] be made without regard to the ameliorative effects of mitigating measures" such as medication, psychotherapy, or behavioral therapy.  28 C.F.R. §§ 35.108(d)(1)(viii), 35.108(d)(4).

Defendants state, without citing any evidence or legal authority, that Plaintiff is not disabled due to mental illness.  Plaintiff counters that because there is a genuine dispute regarding whether Plaintiff suffered from bipolar disorder, Defendants cannot establish that Plaintiff is not disabled.  Indeed, Defendants offer evidence that supports Plaintiff's claim that he is disabled, namely, that (1) "[b]ipolar disorder is a serious and chronic mental illness, that when left untreated, can leave individuals profoundly depressed (including resorting to suicide) or presenting with psychotic features, including illusions of grandeur," [Dkt. No. 115 ¶ 38 (citing Def. Exh. 3 ¶ 15)]; and (2) Plaintiff has "acted out with an episode of self-injury" sufficiently severe to warrant efforts to "ensure

his personal safety," [Dkt. No. 116-2 ¶ 53 (citing Def. Exh. 3 ¶¶ 37-38; Def. Exh. 5 ¶ 26)]. Plaintiff's conduct while incarcerated also included "a period of time when he was exposing himself to female staff," and other "demonstrated behavioral regressions, including threatening and intimidating staff," resulting in more than 47 Disciplinary Reports over the course of 18 months. [Def. Exh. 3 ¶¶ 32, 37]. While Defendants attribute this behavior to "maladaptive behaviors" or "acting out when he does not receive what he believes he is entitled to," [Def. Exh. 3 ¶¶ 34, 36], Plaintiff has offered evidence that his bipolar disorder resulted in "impulsivity, expansive mood and substance abuse" and that his mood would swing from "normal to yelling." [Def. Exh. A].

Plaintiff has also offered evidence that the DOC denied him the opportunity to participate in or benefit from the DOC's services, programs, or activities. He states in his affidavit his disruptive behaviors are consistent with untreated bipolar disorder and ADHD, and as a result of these behaviors, he was placed in administrative and punitive segregation. *Id.* ¶ 17. While in segregation, Plaintiff was denied visitation and telephone privileges, and he was placed in restraints and on behavioral observation status. *Id.*

However, in order to prevail on his ADA claim, Plaintiff must also offer evidence not only that he was denied access to services, but that he was denied access specifically because of his disability. In other words, he must show that he was treated "differently than [other] violent, self-destructive inmates who [were] not disabled due to mental illness," *Atkins v. Cty. of Orange*, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003); *see also O'Guinn v. Nevada Dep't of Corr.*, 468 F.

App'x 651, 653-54 (9th Cir. 2012) (granting summary judgment on ADA claim where inmate asserted that "because he was untreated, he committed misconduct; because of his misconduct, he was disciplined").  Plaintiff has offered no evidence that DOC officials subjected non-disabled inmates engaging in conduct similar to Plaintiff's to different disciplinary measures.  Instead, Plaintiff blames his disruptive behavior on Defendants' failure to provide him with appropriate mental health treatment.

"The ADA prohibits discrimination because of disability, not inadequate treatment for disability."  *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010).  The ADA does not "create a remedy for medical malpractice." *Maccharulo v. New York State Dep't of Corr. Servs.*, No. 08CIV301LTS, 2010 WL 2899751, at *2 (S.D.N.Y. 2010) (quoting *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)); *see also McGugan v. Aldana-Bernier*, 752 F.3d 224, 234 (2d Cir. 2014) (stating that plaintiff should not be permitted to "re-frame claims of medical malpractice into federal claims of discrimination on the basis of disability.").  And the ADA does not "appl[y] to claims regarding the quality of mental health services," *Maccharulo*, 2010 WL 2899751, at *2 (quoting *Atkins*, 251 F. Supp. 2d at 1232), unless the defendant provider "relied on factors that are 'unrelated to, and thus improper to consideration of' the inquiry in question," *McGugan*, 752 F.3d at 234.  Here, Defendants have offered evidence that they denied him treatment for bipolar disorder because they believed that narcissistic personality disorder and antisocial personality disorder better fit his symptoms.  Even if this belief was erroneous, it is related to the provision of mental health treatment rather than a

discriminatory motive unrelated to Plaintiff's medical care. Moreover, Defendants did not deny Plaintiff medical care. On the contrary, they diagnosed him with mental disorders and treated him for those disorders.

Viewed in the light most favorable to Plaintiff, a reasonable jury could not conclude that Defendants' failure to provide treatment for bipolar disorder constituted discrimination on the basis of disability, particularly since they treated him for other mental disorders. Summary judgment on Plaintiff's ADA claim must therefore be GRANTED.

### G. Qualified Immunity

The Defendants argue that they are entitled to qualified immunity. Qualified immunity protects "government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Thus, in evaluating the argument that an official is entitled to qualified immunity a court must determine whether (1) the facts alleged or shown by the plaintiff state a violation of a statutory or constitutional right by the official, and if so, (2) was the constitutional right clearly established at the time of the challenged conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). The Supreme Court has held that district courts have the discretion to choose which of the two prongs of the qualified immunity standard to address first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As indicated in the previous section of this ruling, the Court has concluded that issues of material fact exist with regard to whether Dr. Frayne retaliated

against Plaintiff for exercising his rights under the First Amendment and whether Drs. Frayne and Gagne were deliberately indifferent to Plaintiff's medical needs. While Defendants provide a lengthy exposition on the contours of qualified immunity generally, they do not argue with any specificity that the constitutional rights or legal protections Plaintiff asserts were unclear at the time of the challenged conduct.

Thus, the Court concludes that genuine issues of material fact preclude a determination that the defendants are entitled to qualified immunity. *See Palmer*, 364 F.3d at 67 (factual issues as to typicality of confinement precluded summary judgment on qualified immunity grounds on question of clearly established right); *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("Summary judgment on qualified immunity is not appropriate when there are facts in dispute that are material to determination of reasonableness."); *Weyant v. Okst*, 101 F.3d 845, 858 (2d Cir. 1996) (holding that matter of officers' qualified immunity could not be resolved as a matter of law because determination whether it was reasonable for officers to believe their actions met established legal principles depended on disputed version of facts).

Accordingly, Drs. Frayne and Gagne not entitled to summary judgment on the basis of qualified immunity. The motion for summary judgment is DENIED on this ground.

V. <u>Conclusion</u>

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment [Dkt. No. 116]. All claims

except for Plaintiff's deliberate indifference and First Amendment retaliation claims are DISMISSED.  The Clerk is directed to terminate all Defendants other than Frayne and Gagne.

**IT IS SO ORDERED.**

Vanessa Bryant
*Vanessa Lynne Bryant* 2018.05.25
09:37:14 -04'00'

**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: May 25, 2018**